UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEONARD GEGA, <br><br> Plaintiff, <br><br> vs. <br><br> HAROLD LEVINSON ASSOCIATES, LLC, <br><br> Defendant. | Civil Action No. 1:21-cv-6467 <br><br> **COMPLAINT** |

1. Plaintiff Leonard Gega, by and through his attorneys, The Law Office of Christopher Q. Davis, PLLC, alleges upon personal knowledge and information and belief as to other matters, as follows:

**NATURE OF ACTION**

2. Plaintiff Leonard Gega ("Mr. Gega" or "Plaintiff") brings this action against Defendant Harold Levinson Associates, LLC ("HLA" or "Defendant") for monetary and emotional damages suffered for violations of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA") and the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq*. ("NYSHRL").

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA, a series of federal laws.

4. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

5. This Court has personal jurisdiction over Defendants because Defendants'

1

principal place of business is located in New York; additionally, the claims arose out of Defendants' contacts with New York and Defendants acted in such a way as to cause Mr. Gega injury in the state of New York.

6. Venue is proper in the United States District Court, Eastern District of New York pursuant to 28 U.S.C. § 1391, because the violations which give rise to Plaintiff's claims occurred in this District.

## PARTIES

7. At all relevant times, Plaintiff resided in the state of New York and currently resides in Jackson Heights, New York.

8. From April of 2019 to April 30, 2021, Defendant employed Mr. Gega as a Director of Strategy and Special Projects, and then as Senior Vice President ("SVP") of Business Development. As SVP of Business Development, Mr. Gega was responsible for the merger and integration of acquired businesses, and marketplace strategy and analytics.

9. Defendant HLA maintains a principal place of business at 21 Banfi Plaza, Farmingdale, NY 11735. At all relevant times, Plaintiff worked at this location.

## FACTUAL STATEMENT

10. In 2016, Mr. Gega established a company named "Grumbol," which is a SAAS data analytics start-up that develops big data insights for manufacturers, retailers, and distributors.

11. In 2017, Mr. Gega pitched Grumbol's services to HLA and signed a non-disclosure agreement with one of the HLA's Vice Presidents.

12. However, both Mr. Gega and HLA ultimately decided not to move forward with the prospective partnership at that time.

13. Thereafter, in or around April of 2019, Mr. Gega was hired directly by Defendant as a Director of Strategy and Special Projects.

14. In this role, Mr. Gega was responsible for advising the CEO, and other c-suite employees, by providing strategic analysis, developing strategic vision, and leading transformational initiatives at the Company.

15. On August 1, 2020, Mr. Gega was promoted to Senior Vice President ("SVP") of Business Development.

16. As SVP of Business Development, Mr. Gega was responsible for merger and integration of acquired businesses and marketplace strategy and analytics.

17. In October 2020, Mr. Gega was contacted about resuming talks regarding a partnership with his start up business, Grumbol.

18. On or around November 2020, Mr. Gega requested a leave of absence through the FMLA and the New York State Paid Family Leave law ("NYSPFL"), which were to run concurrently.

19. Mr. Gega requested the time off in anticipation of his child's birth on November 21, 2020.

20. Ultimately, Mr. Gega elected not to take FMLA/NYSPFL at that time. He just received the FMLA/NYSPFL paperwork at that time.

21. On December 10, 2020, Mr. Gega met with Ed Berro and Rita Berro, the original owners of HLA, to again discuss Grumbol.

22. Mr. Berro expressed his frustration with Mr. Gega for working on Grumbol even though he knew Mr. Gega owned Grumbol prior to being an employee at HLA and Mr. Gega worked on Grumbol on his own time.

23. As a result of the meeting, Mr. Gega wound-up Grumbol on December 31, 2020.

24. On January 21st, 2021, Mr. Gega had back surgery to remove portions of a herniated disc that was causing pressure on his nerves.

25. Mr. Gega took 3-4 days off from work for the surgery.

26. Thereafter Mr. Gega returned to work, albeit remotely from home, so he would be able to sit and stand and move his back to prevent scar tissue from building up and causing complications.

27. After returning from his back surgery, at Mr. Berro's direction, Mr. Gega shared a new pitch deck for Grumbol on January 25, 2021, and Grumbol's financials on February 11, 2021 because he was told that Palm Beach Capital, a private equity investment firm holding majority stake in HLA, and HLA, was interested in creating a new entity doing the work Grumbol set out to do, separate from HLA, as a partnership.

28. In March of 2021, Mike Schmickle, a Partner at Palm Beach Capital, informed Mr. Gega that, due to timing, HLA and Palm Beach Capital would not pursue the partnership with Grumbol.

29. Thereafter, on April 1, 2021, Mr. Berro and Mr. Gega had a detailed discussion about Mr. Gega's future at HLA.

30. During the meeting, Mr. Berro told Mr. Gega that he "had a future with HLA if [he] wanted one" and that he had "made an investment" in Mr. Gega.

31. During the above-mentioned April 1, 2021, meeting Mr. Gega made clear to Mr. Berro that he wanted a future with HLA and was looking forward to continuing the successes he had while employed with HLA.

32. After the April 1, 2021 discussion, solidifying Mr. Gega's role and future with

HLA, Mr. Gega continued diligently working on multiple projects he was assigned to that aimed at providing efficiencies for HLA.

33. Mr. Gega's final project prior to his unlawful termination involved coordination of 1 hour sessions with each and every sales manager at HLA (between 10-15 people), as well as sales personnel to identify who had primary top customer responsibility for each group, what incentive, payments, pricing and rebate programs were authorized on a weekly or monthly basis to these customer groups, what store falls under a group number - or as HLA referred to these multi-store groups - consolidated accounts, and identified stores in these consolidated groups that were in multiple groups that were potentially receiving multiple payments due to the lack of controls and audits at HLA.

34. Additionally, shortly before he was terminated, on or around April 22, 2021, Mr. Gega was responsible for making an integral presentation to C-suite level employees about the work he was doing to provide more efficiency at HLA, including but not limited to, a review of all multi-store operators serviced by NCD and identifying duplication of retail stores, incorrect ownership and salesperson information, obsolete accounts, and "double-dipping" of rebates and incentives HLA paid their customers.

35. In this meeting was Chief Executive Officer Ed Berro, Division President Rita Berro, Chief Operating Officer Paul Murphy, Senior Vice President of Sales Martin Glick, the Chief Financial Officer, several if not all of the IT Directors, several data analysts, and the Vice President of HLA Sales.

36. Based on the information presented by Mr. Gega at this meeting, Mr. Berro became visibly upset and yelled at the SVP of sales, Martin Glick, for not having a handle on the topics presented.

37. This project that Mr. Gega was responsible for was a priority for the implementation of the new $8 million enterprise resource planning and was accomplished in 6 weeks by Mr. Gega, just three days before he was informed of his termination.

38. Mr. Gega was informed by the Director of Information Technology that prior attempts at HLA by other employees to do the same type of analysis to identify similar issues was unable to be accomplished in 1.5 years and was abandoned as an "impossible" task due to the record keeping and data integrity in HLA's systems.

39. These examples clearly establish that Mr. Gega was, at all times throughout his employment, and integral employee at HLA.

40. Mr. Gega was directly responsible for developing retail incentive programs to divest unprofitable customers, reduce operational expenses, and working with M&A – all of which were integral to HLA's profitability.

41. Mr. Gega's role and future at HLA was unmistakably solidified within the first week of April – before he put in his request for FMLA – after which he was terminated almost immediately.

42. Specifically, on April 14, 2021, Mr. Gega submitted a FMLA/PFL request to attend to his son who was scheduled to undergo surgery on May 7, 2021.

43. Mr. Gega requested leave was to begin on May 10, 2021.

44. Even before Mr. Gega made his formal request for FMLA/PFL, Ed Berro, Rita Berro and Paul Murphy all knew that Mr. Gega's son would need surgery at some point within the next few months.

45. In fact, it was known at the child's birth, in November 2020, that Mr. Gega's son would need surgery and they would be waiting until he was about 6 months old until it was

scheduled.

46. Mr. Gega had doctors' appointments for his son on December 8, 2020 and March 11, 2021, after which he had casual conversations with Mr. Berro, Ms. Berro and Mr. Murphy about his son's need for surgery.

47. Mr. Gega submitted his request shortly after scheduling the surgery, the date of which had been uncertain up to that point.

48. The day after submitting an email requesting FMLA, on April 15, 2021, a Human Resources ("HR") representative asked Mr. Gega whether the FMLA/PFL request was for bonding or surgery.

49. While it made no difference either way, because Mr. Gega would have been entitled to FMLA leave to either bond with his child within the first 12 months of life (which this was) or care for his child with a serious health condition (which includes surgical procedures), Mr. Gega responded that the request was for "bonding" with his son.

50. After this correspondence, Mr. Gega did not receive any additional information from HR regarding his FMLA/PFL request until he was terminated two weeks later.

51. On April 30, 2021, about two weeks from when Mr. Gega submitted an FMLA leave request, he was terminated.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Interference with FMLA Leave in Violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"))**

52. Mr. Gega was an "employee" within the meaning of the FMLA.

53. HLA was Mr. Gega's "employer" within the meaning of the FMLA.

54. HLA is, and has at all relevant times, been a covered employer under the FMLA.

7

55. Mr. Gega is, and has been at all relevant times, a qualifying individual who was entitled to FMLA leave. *See* 29 U.S.C. § 2612(a)(1); 29 C.F.R. § 825.120(a)(2).

56. Under 29 C.F.R. § 825.120(a)(2), an employee is entitled to FMLA leave to bond with a newborn child during the twelve-month period beginning on the child's date of birth.

57. As Mr. Gega's child was born on November 21, 2020, he was well-within the twelve-month period when he requested FMLA on April 14, 2021.

58. Under the FMLA an employee is also entitled to leave to care for a minor child with a serious health condition, which includes conditions requiring inpatient care such as surgery.

59. On April 14, 2021, Mr. Gega submitted a FMLA to begin on or around May 7, 2021, when his son was scheduled to have surgery, which wasas soon as was possible and practicable under the circumstances. *See Golden v. N.Y. City Dep't of Envtl. Prot.*, No. 06 CIV. 1587, 2007 WL 2319130, at *4 (S.D.N.Y. Aug. 10, 2007) ("[I]n assessing notice under the FMLA, '[t]he critical question is whether information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off'").

60. On April 30, 2021, about two weeks after Mr. Gega submitted a leave request, he was terminated.

61. Mr. Gega not only provided HLA with twenty-seven days' notice but also provided the Company with sufficient information to determine whether the FMLA applied to his request.

62. HLA interfered with Mr. Gega's ability to take FMLA leave by terminating his employment on April 30, 2021, just eleven days before his requested leave would have begun. *See* 29 C.F.R. § 825.220.

63. HLA's interference with and failure to authorize Mr. Gega's FMLA leave was willful within the meaning of the FMLA § 2617(a) such that Mr. Gega is entitled to liquidated damages.

64. By the actions described above, HLA, by and through its employees and/or agents, interfered with Mr. Gega's right to FMLA leave and denied him benefits to which he was entitled under the FMLA.

65. As a direct result of HLA's actions, Mr. Gega has suffered and continues to suffer harm for which he is entitled to an award of damages, including monetary damages, compensatory damages, liquidated damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Retaliation for Requesting FMLA Leave in Violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"))**

66. Mr. Gega hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

67. Mr. Gega was an "employee" within the meaning of the FMLA.

68. HLA was Mr. Gega's "employer" within the meaning of the FMLA.

69. Mr. Gega is, and has been at all relevant times, a qualifying individual who was entitled to FMLA leave.

70. HLA is, and has at all relevant times, been a covered employer under the FMLA.

71. On April 14, 2021, Mr. Gega engaged in protected activity when he attempted to exercise his right to take leave to bond with his child for which he was qualified under the FMLA.

72. Mr. Gega was qualified for his position because he was not only hired by HLA, but promoted just months after joining the Company, and just one month before his termination he was told he "had a future" at HLA. *See e.g., Fuentes v. Cablevision Systems Corp.*, No. 14-CV-32, 2016 WL 4995075, at *9 (E.D.N.Y. Sept. 19, 2016) (quoting *Cooper v. N.Y.S. Nurses Ass'n*, 847 F. Supp. 2d 437, 448 (E.D.N.Y. 2012) ("A plaintiff need not show good or even average performance to demonstrate that he is qualified for his position, but must merely show he 'had the basic qualifications.'").

73. On April 30, 2021, eleven days before his requested leave would have begun, HLA terminated Mr. Gega for requesting to take FMLA leave for which he was entitled.

74. The temporal proximity between when Mr. Gega was about to take his FMLA leave and his termination – only 11 short days – clearly creates circumstances giving rise to an inference of retaliatory intent.

75. As a direct result of HLA's actions, Mr. Gega has suffered and continues to suffer harm for which he is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

76. HLA's retaliatory actions were willful within the meaning of the FMLA § 2617(a) such that Mr. Gega is entitled to liquidated damages.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Discrimination in Violation of the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq*. ("NYSHRL"))**

77. Mr. Gega hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

78. Mr. Gega was an "employee" within the meaning of the NYSHRL.

79. HLA was Mr. Gega's "employer" within the meaning of the NYSHRL.

80. HLA unlawfully discriminated against Mr. Gega by firing him two weeks after Mr. Gega submitted a request for time off to care for his son who was getting surgery.

81. Under the NYSHRL, it is an unlawful discriminatory practice "[f]or an employer or licensing agency, because of an individual's . . . familial status . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

82. "Familial status" applies to any individual who is pregnant, has children under eighteen years old, or is under eighteen and living with the described parent. *See* N.Y. Exec. § 292(26).

83. Mr. Gega is a father of a young son who required surgery.

84. Under state and federal law, Mr. Gega was entitled to take time off to care for his son.

85. Mr. Gega was qualified for his position – in fact, during the time he was employed by the Company, he was promoted to Senior Vice President. However, despite being qualified for his position, Mr. Gega was the only Senior Vice President who was terminated shortly after he requested time off to take care of his son.

86. On April 14, 2021, Mr. Gega indicated that he needed to take time off to care for his son who was scheduled to get surgery in May 2021.

87. Shortly after he spoke to HR about his request, he was fired on April 30, 2021.

88. The short proximity of time from when Mr. Gega requested a leave of absence to when he was fired gives rise to an inference of discrimination.

89. As a direct result of HLA's actions, Mr. Gega has suffered and continues to suffer harm for which he is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter a judgement in his favor and against Defendants, containing the following relief:

(A) A declaratory judgment that the actions, conduct and practices of Defendants complained herein violate the Federal laws of the United States;

(B) That Defendant is found to have violated the provisions of the FMLA as to Plaintiff;

(C) That Defendant is found to have violated the provisions of the NYSHRL as to Plaintiff;

(D) That Defendant's violations as described are found to be willful;

(E) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary/economic damages;

(F) An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety,

loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and loss of reputation;

(G) An award of liquidated damages, in an amount to be determined at trial;

(H) An award to Plaintiff of the costs of this action, including reasonable attorneys' fees and case expenses to the fullest extent permitted by law;

(I) Statutory fines and interest;

(J) Such other and further relief, in law or equity, as the Court deems necessary and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues of fact and damages stated herein.

Dated: November 19, 2021  
      New York, New York

Respectfully submitted,

    /s/  
Christopher Q. Davis, Esq.  
Rachel M. Haskell, Esq.  
The Law Office of Christopher Q. Davis, PLLC  
80 Broad St, Suite 703  
New York, New York 10004  
646-430-7930 (main)  
cdavis@workingsolutionsnyc.com  
rhaskell@workingsolutionsnyc.com